Case number 15-7121. Enron Nigeria Power Holding Ltd. v. Federal Republic of Nigeria Appellant. Mr. Ellis Omugun for the Appellant. Mr. Barrett for the Appellee. Good morning. Good morning, Your Honor. My name is David Ellis Omugun, appearing for the Federal Republic of Nigeria. I'd like to reserve three minutes for rebuttal. Your Honor, the main issue before this Court this morning is whether confirming and enforcing the award that the ICC granted the appellee in this matter would amount to rewarding fraud or rewarding misrepresentation, which violates a public policy of the United States that no one should be allowed to profit from his own fraud or acquire property thereby. Didn't the ICC make factual findings on your fraud claims? And they found that there was no fraud, right? Those are their factual findings. Well, Your Honor, when the ICC made that ruling in the initial, it gave several interim awards. The award on liability, when it made that finding, when it came to the final award, it appeared as if the ICC itself was contradicting its stance on the effect of Enron Corporation. If we didn't read it that way, let's suppose we read it that, in fact, the ICC did not find fraud here. We're bound by that, aren't we, under the New York Convention, under fundamental law. We are bound by the factual findings, aren't we? Well, Your Honor, the fraud in this question is already fraud that's already been established in the United States. The Enron scandal. No. If the ICC says there's no fraud, we don't have any jurisdiction to review that. That's about the most fundamental point of arbitration agreements, right? Yes, Your Honor. Yes, Your Honor. You may not want to concede that too readily. No, that's why I'm trying to refer, Your Honor, to the fact that when it was given the liability award itself, when we read, because you have, we're asking the court to look at the entirety of the case, look at the factual conclusions that the ICC came to itself. In fact, it got to a stage in their conclusions that they were doing this dance between the scandal and Enron. So you're saying a fair reading of what the ICC did does not lead to the conclusion that they found it's a factual matter that there was, that the factual basis for your fraud claim didn't exist. That's what you're saying. Your Honor, may I refer this court to the final award that especially is in the joint appendix, paragraph 103 in the joint appendix. And here are some of the conclusions that the ICC itself came to. And if you will permit me to just read it out in their own very words. Most significant was the subsequent bankruptcy of Enron Corporation, Enron International, and EEC. This substantially changed many of the assumptions on which the original PPA schedules were based, including, in particular, ENPA's ability to perform the contract. The judicial notice can be taken of the fact that the Enron scandal was based on misrepresentation of its finances. To the general public, the ICC that was regulating it itself was hoodwinked. No, but let me ask, reading the record, assuming everything you say is correct. Yes, ma'am. I thought the ICC had decided that or had found that whatever was going on with the Enron Corporation was not material to the agreement at issue here. That the agreement called for, you know, finding independent sources for financing, etc. And that no representation was made in the party's agreement that Enron Corporation itself would somehow back up the agreement financially or materially or in any other way. Yes, Your Honor, again, I would like to refer you to how the ICC itself was surprised that when AES, that had the opportunity of exercising the option agreement, reached out to ENPH. That's the appellee in this case. ENPH could not respond for three years because of the Enron scandal. In fact, if we go to the joint appendix, page 8212, specifically paragraph 119, the court itself said, acknowledged the fact that it was surprised that for three years nothing could be done because the bankruptcy was taking place. Everyone that could have made a decision in this matter was involved in the bankruptcy. During the PowerPoint presentation to the President of the Federal Republic of Nigeria, one of the strong points that ENPH really pushed was that, look, Enron has $30 billion in annual revenue. We are the leading corporation in gas and electricity. These representations were made. There was nothing said about ENPH. ENPH was just barely formed four months ago. There was no basis for Nigeria to have entered into a contract with ENPH. The World Bank and everybody that looked at this deal was actually seeing Enron. When Enron's bankruptcy came through, the whole transaction stopped. There was no communication between the parties for three years. ENPH could not proceed with the contract, and the ICC itself acknowledged this at every step of the way. Initially, when it was given the award, it said, no, ENPH and Enron are totally separate corporations. But when it came to the liability, it found itself in a bind. It found itself in a bind to separate the two corporations. And Nigeria has made the argument that ENPH and Enron were basically one and the same company. That was Enron's mode of operation back in the 80s. It would create the special purpose vehicles. There were shell corporations. It ran the corporations. The people who negotiated the deal were all staff of Enron. Everything was Enron. ENPH was simply Enron in another suit. There was no difference. As soon as the bankruptcy of Enron came through, the project could not go further. Even when AES approached and said, look, we want an extension of the option, for three years, it was silent. Because everyone that was involved in this deal was dealing with the Enron scandal. There was no way it could have gone through. Allowing ENPH, a subsidiary of Enron, a shell corporation that had share capital of $1,000, had never done any deal at all. So let me go back to the point Judge Griffith was exploring with you. In your view, then, in our review of the district court's decision, what is the standard we are to apply to the findings by the ICC? In other words, your argument sounds like you're treating the ICC almost as though it were a district court, and we're reviewing those findings to see if there was an error of law or a clear error of fact. You're to review the district court's opinion. And the district court, in its opinion, has said it appears as if Nigeria is trying to use this opportunity to re-litigate the issues that had already been settled. In other words, you have not argued, as I understand it, that there was anything fraudulent or corrupt in the ICC proceeding itself. For example, there was no conflict of interest among the... Among the... Oh, no, no, no. Exactly. Our arguments are based on Article 5, 2B of the New York Convention. I understand. And I need to understand, and I thought that's what Judge Griffith was asking you, is what do you understand our standard of review to be of the ICC findings? And you sort of made two arguments. One is that they never made the findings that there was no fraud, that if you look at the several opinions that they issued, they were confounded by what happened once Enron declared for bankruptcy, realizing that that undercut the whole deal. Yes. But they never found, did they, that... They never made the finding you're asking us to say they should have found. And that's why I need to understand what is our standard of review in your opinion. Well, in my opinion, I reviewed the award and how they arrived at it. And when I reviewed the analysis and the conclusions of the ICC, I saw that they acknowledged the effect Enron's bankruptcy had on the entire transaction, that Enron's bankruptcy, which judicial notice can be taken of, was as a result of fraud. So your point is that this court, as the district court, has jurisdiction to consider whether the underlying contract was... Was fraudulently procured. Yeah. Yeah, because at that, during the PowerPoint presentation to the president, EMPH's speech was based on the fact that, look, Enron is a solid company, financially viable. This is a company that we're affiliated with, that has found us, that we stand behind this deal. And it's specifically related to the issues of the value of Enron. In fact, as at that time, Your Honor, Enron was already actually bankrupt. What I'm concerned about is the Supreme Court has told us that in certain circumstances, this court or the district court should look at the underlying contract between the parties, even in the case of arbitration. On the other hand, the Supreme Court told the unanimous panel of this court that when it held that the contract interpretation was for the court, the Supreme Court reversed, saying, no, that was for the arbitrator in the Argentina case. So I need to understand where we are now in terms of the standard of review. Your Honor, I think the standard of review is to review... My time is up, Your Honor. I've reserved three minutes for rebuttal. I'll be here for further questions. All right. Thank you. Thank you. Good morning. Good morning. May it please the Court. My name is Kenneth Barrett, and I represent Enron Nigeria Power Holdings Limited. The Court has raised an issue as to what the standard of review is for this court in terms of the findings of the arbitration panel constituted by the International Commerce Commission. And it is clear that this panel's standard of review is de novo of the district court's decision. But the district court and all courts in the federal system are to give great deference to the factual findings of the arbitration panel. There is no question in this case as to the fairness, as to the procedures, or as to the scope of the arbitration that took place over the six years. This arbitration panel spent six years' worth of proceedings on over 100 pages in opinions in evaluating some of the very arguments that the appellant is asserting here as a grounds for the invocation of the public policy exception. But as I understand it, counsel is arguing not that there was anything fraudulent or corrupt as to the panel, the ICC panel, or its procedures. But rather, if you look at their several decisions, they in effect found that there was this unity of entities, there was this sort of overarching presence of Enron Corporation in this transaction, and we should take that into account. The court is correct. The first decision under consideration is the partial award on remedies, and that's a decision in which the arbitration panel went through the defenses, the claims, and the counterclaims of all the parties, including the defense of fraud, the defense of misrepresentation, the defense of illegality, and the argument by at least one of the respondents that Enron and EMPH were all one entity. The arbitration panel rejected each of those, and those are the factual underpinnings for the public policy argument. Then the arbitration panel addressed the issue of damages in what it called the final award on remedies. The EMPH asked the panel to consider lost profits as a measure of damages, and the arbitration panel rejected that on the grounds that there were several uncertainties. It acknowledged that Enron Corporation could have been a resource, but it was not a required resource under the terms of the PPA, and it acknowledged that the bankruptcy had occurred and determined that there were too many uncertainties to award lost profits. The parties all agreed that lost opportunity was the best measure of damages, and it went through an analysis and it looked at what could have happened given the circumstances, and it concluded that the power purchase agreement, which it considered to be a legal agreement, had some value. As of the time of nine days after it was signed, it had some value at that particular point in time and went ahead and awarded damages. It did engage in some analysis as to the assets of EMPH, but it determined that that did not preclude an award of damages. Because EMPH was not obligated to build the power plant itself. It was not obligated to provide all the money. It could seek independent resources to do so. Therefore, it went ahead and made its award in EMPH's favor, an award that was substantially less than what EMPH had initially asked for in the arbitration. I understand your point that we owe special or high deference to the actions, to the decision here, but suppose we look at all of this evidence and conclude that this just can't be right, that it's just wrong. Can we do that? If I look at all of this evidence, each one of these items individually, the PowerPoint, the 1999 letter, the August memorandum of understanding, the additional documents, the evidence of a sham transaction. As I look at those, I think to myself, okay, well, individually I get it, but in their totality, I wonder about the legitimacy of this decision. I understand, Your Honor. It's clear that Enron Corporation has one of the most toxic names in Merrill Business District. Yeah, I got that, but I was setting that aside. Right. I'm just looking at the facts. You set that aside and look at the chain of events. In June 1999, negotiations began for this power purchase agreement that had three phases. Two phases, one in three. Before you go through that, and I appreciate the fact that you're going to, this court can upset that decision if we think it's just flat out wrong, correct? I believe that. No, it's not binding on us. We just owe special deference. Great. It's a tremendous amount of deference. Tremendous, but that doesn't mean we just say, okay, whatever they did is, you know. We're not bound by it, right? Right. The court is not a rubber stamp. We're not a rubber stamp. Right. Okay, now just explain to me quickly why when you look at all of these actions together. If you look at all the actions. Yeah, why isn't Nigeria correct about this? Because the actual agreement that was signed between the parties has resulted in the provision of electrical generation capacity in Nigeria. It is a legitimate agreement. Phases one and three were renegotiated by the parties, and today in Lagos, this afternoon, there are businesses and schools that are running on electricity generated as a result of this deal. The Enron Corporation may have engaged in misdeeds, but as to this particular agreement, it's a legitimate agreement that did not go forward nine days after it was executed because Nigeria decided to long before the Enron bankruptcy occurred in, I think, November of 2001. So, you know, there are some unfortunate acts by some in Enron, you know, in 1999 and late 2000, but they are not tied to this particular agreement. There are three grounds for affirming this decision. Counsel, let me follow up on Judge Tate's question. What's your view about when we can look, when we can review the factual determinations of the ICC? You said we're not a rubber stamp. What are we? When are we authorized to look at the factual findings of the ICC and say, well? I believe one situation is a situation in which the arbitration panel clearly does not apply the applicable law. This is a situation where the panel used British, or rather Nigerian law, which is premised on the same law that governs the United States in terms of fraud and misrepresentation and breach of contract. So I suspect that that's one situation. You're saying if the ICC used the wrong law? If they were totally familiar with the law. Let's say they decided to use Japanese law to resolve. Right, they used Japanese law, or it was clear they gave lip service to applying the applicable law, in this case, which was Nigerian law. Okay. Here's another instance. Frankly, it's difficult to think of a circumstance unless it's clear from the record that the evidence supporting the position of one of the parties that was given credence by the arbitration panel was a lie or blatantly incorrect. Was what? It was fabricated. What was fabricated? If there's some indication that evidence was clearly fabricated. I see, I see, I see. That may be a circumstance where the court was. Suppose the panel decided it wasn't fabricated. In other words, do you know of any case that bars this court from doing the type of analysis Judge Tatel's question suggested and reaching its own conclusion about the nature of this agreement and the influences underlying it? I am unaware of a case that is that explicit, but there is Supreme Court precedent and precedent from other circuits that says that the arbitration panel's decisions and factual analysis and application of a lot of facts does deserve great deference and it is not the judge or the province of the courts to review. So I'm trying to understand as well as whether the New York Convention establishes a different type of regime than the Federal Arbitration Act. Clearly, I think you agree that the Article V defense is heavy burden on the party trying to establish them. But you haven't argued that we're bound, that we can't look at those factual findings. I mean, if we were looking at the district court's decision in a trial and we concluded clearly erroneous that we have an abiding conviction that the district court made a mistake, are those the same type of standards we apply in the New York Convention context or is there some other regime that applies? Or don't we know? I have not found any case precedent addressing that particular question, but I do know that the policy in support of the convention and in support of the Federal Arbitration Act strongly favors affording great deference to the arbitrator's findings. Great deference. What does that mean? Unless we have an abiding faith that an error was made. Yeah, unless there is clear, absolute evidence of an error in terms of the factual... And what's your argument that that didn't occur here in light of the factors Judge Tatel pointed to? Why doesn't that point us in the direction that maybe the ICC panel is just way off basing? Well, the facts are that part of the agreement was executed and after the agreement was suspended, the parties got together and started renegotiating, and they renegotiated portions one and three. I don't understand how what happened after the fact really influences our decision here. Just because you and I enter into a contract that fails doesn't mean I can't go out and make another contract that succeeds. But I don't know that it has anything to say about our contract. Well, in this situation, the fact that the parties did some more negotiating after the suspension of the agreement and reached an agreement, an executed agreement, and they have electricity, of the fact that the original agreement was not fraudulent. I don't... I mean, I can give you hypotheticals where that wouldn't work. You know, you and I have an agreement, and I say that's fraudulent, and you say, okay, I'll change my view. Right. I think there's one finding of the arbitration panel that the court... but for the issue between the parties as to price. If that's the case, then the fraud argument, which was generated after the arbitration proceedings were initiated, doesn't seem as valid at this stage. I can see my time is up.  Thank you, Your Honor. All right. Your Honor, we just want to kind of make one point of clarification with respect to the issue of renegotiation. Now, when the contract initially was stayed, nine days after its execution, Nigeria did, in good faith, actually try to renegotiate different phases of the project. But that negotiation spanned... As of that time, Aaron's Corporation's bankruptcy had not yet come through, so it was still under the assumption that the facts that it was given, the representations, were real, were true. It had no basis to doubt that. Phase one and phase two, because Nigeria did negotiate in good faith, yes, did go through. But during the course of the negotiations, the bankruptcy came through. It realized that Aaron Corporation was no longer going to be there and that the financials that had been presented were actually fraudulent. Thank you, Your Honor. Thank you. We'll take the case under advisement.
judges: Rogers, Tatel, Griffith